# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGIE CALLWOOD, JOHNATHON HARDAWAY, individually and on behalf of their minor children A.H. and J.H., | **FIRST AMENDED COMPLAINT** Case No. 1:15-cv-01298 (GLS/TWD) |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| CITY OF KINGSTON, MICHAEL MILLS, individually and as an agent and employee of the Kingston Police Department, ROBERT FARRELL, individually and as an agent and employee of the Kingston Police Department, TIMOTHY BOWERS, individually and as an agent and employee of the Kingston Police Department, RICHARD NEGRON, individually and as an agent and employee of the Kingston Police Department, KIRK STRAND, individually and as an agent and employee of the Kingston Police Department, EMILY-CLAIRE E. SOMMER, individually and as an agent and employee of the Kingston Police Department, COUNTY OF ULSTER, MICHAEL IAPOCE, individually and as an agent and employee of the Ulster County Department of Social Services, BARBARA SORKIN, individually and as an agent and employee of the Ulster County Department of Social Services, PAMELA JOERN, individually and as an agent and employee of the Ulster County Department of Social Services, JAMES MEYER, individually and as an agent and employee of the Ulster County Department of Social Services, DENISE TIMBROUCK, individually and as an agent and employee of the Ulster County Department of Social Services, and AMY GREENE, individually and as an agent and employee of the Ulster County Department of Social Services, PEGGY WEBB, individually and as an agent and employee of the Ulster County Department of Social Services, HOLLEY CARNRIGHT, individually and as an agent and employee of the Ulster County District Attorney's Office, ELIZABETH CULMONE-MILLS, individually and as an agent and employee of the Ulster County District Attorney's Office, TAMATHA STITT, individually and as an agent and employee of the Ulster County District Attorney's Office, | |
| Defendants. | |

Plaintiffs Angie Callwood, Johnathon Hardaway, A.H., and J.H., by their attorney Johnathon Hardaway, for their complaint against defendants allege as follows:

## INTRODUCTION

1.     This is an action at law to redress the deprivation by defendants, acting under color of statute, ordinance, regulation, custom and/or usage, of a right, privilege or immunity secured to plaintiffs Angie Callwood, Johnathon Hardaway, A.H., and J.H. by the First, Fourth, Eighth, and Fourteenth Amendments of the Constitution of the United States of America with intent to deny plaintiffs their civil rights, all of which arise under Federal Law, particularly Title 42 U.S.C. §§ 1983 and 1988, and the Constitution, laws and statutes of the United States, and the State of New York.

2.     The defendants deprived plaintiffs of these rights when defendants entered plaintiffs' hotel room and searched it without cause, imprisoned and removed children from adult plaintiffs' custody without cause, arrested adult plaintiffs, and the plaintiffs were forced to endure nine months of family court and criminal court proceedings without reason or justification, maliciously in violation of their civil rights.  The essence of this action is summarized by the July 8, 2014 opening statement of attorney Franklyn Engel guardian *ad litem* for the children plaintiffs in a neglect trial initiated by defendants:  "In my 40 years plus of representing children, I frankly, having in this case taken part in the preliminary hearing and the depositions, can't figure out where the imminent risk is of harm to these children.  I've represented babies that were born into crack cocaine, little children that were horribly sexually abused by members of the family.  These kids are marvelous.  Any parents would be proud to have children like this, and now that they're back with their parents, as far as I can tell, insofar as any of the evidence that I've heard or seen, they're going to continue to thrive just fine.  That's all."

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter under the provisions of 28 U.S.C. §§ 1331 and 1343 because it is filed to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States secured by the Constitution and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.  This Court has supplemental jurisdiction over plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

4.     This Court also has jurisdiction under 28 U.S.C. § 1332 because this case involves the plaintiffs which are citizens of one state suing defendants which are citizens of another state and the amount of damages is more than $75,000.

5.     Venue is proper under 28 U.S.C. § 1391(b)(1), (b)(2) because at least two of the defendants reside in the Northern District of New York, all defendants reside in New York, and because a substantial part of the events and omissions giving rise to these claims occurred in this District.

6.     In accordance with New York State General Municipal Law § 50 and within ninety days from the date when the below state law cause of action accrued, plaintiffs served a Notice of Claim and intention to sue the City of Kingston.

## PARTIES

7.     Plaintiffs Angie Callwood, Johnathon Hardaway, and their minor children daughter A.H. and son J.H. (collectively "plaintiffs", unless otherwise referred to individually) are citizens of the United States of America and are residents of the State of Florida.

8.     Defendant City of Kingston (hereinafter "defendant City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant, defendant City, acting through the Kingston Police Department (hereinafter "KPD"), was responsible for the

policy, practice, supervision, implementation and conduct of all KPD matters and was responsible for the appointment, training, supervision, discipline, retention and conduct of all KPD personnel. Furthermore, at all times relevant, defendant City was responsible for enforcing the rules of KPD, and for ensuring that KPD personnel obey the laws of the United States and the State of New York. Its principal place of business is 420 Broadway, Kingston, NY.

9.      Defendants KPD Sergeant Kirk Strand, Detective Timothy Bowers, Detective Richard Negron, Officer Michael Mills, Officer Robert Farrell, and Officer Emily-Claire Sommer, at all times material hereto, were duly appointed by, employed by and acting as employees, agents and servants of the City of Kingston, and are sued in both their official and individual capacities. Defendants' principal place of business is 1 Garraghan Drive, Kingston, NY.

10.     Defendant County of Ulster (hereinafter "defendant Ulster") is a municipal corporation organized under the laws of the State of New York.  At all times relevant, defendant Ulster, acting through the Ulster County Department of Social Services (hereinafter "UCDSS") and Ulster County District Attorney's Office (hereinafter "UCDAO"), was responsible for the policy, practice, supervision, implementation and conduct of all UCDSS and UCDAO matters and was responsible for the appointment, training, supervision, discipline, retention and conduct of all UCDSS and UCDAO personnel.   In addition, at all times relevant, defendant Ulster was responsible for enforcing the rules of UCDSS and UCDAO, and for ensuring that UCDSS and UCDAO personnel obey the laws of the United States and the State of New York.  Its principal place of business is 6th Floor County Office Building, 244 Fair Street, Kingston, NY.

11.     Defendants UCDSS Commissioner Michael Iapoce, Deputy Commissioner Barbara Sorkin, attorney Pamela Joern, and caseworkers James Meyer, Denise Timbrouck, Amy Greene, and Peggy Webb, at all times relevant, were duly appointed by, employed by and acting

as employees, agents and servants of defendant Ulster, and are sued in both their official and individual capacities. Defendants' principal place of business is 268 Clinton Avenue, Kingston, NY.

12.     Defendants UCDAO District Attorney Holley Carnright, Assistant District Attorney Elizabeth Culmone-Mills, and investigator Tamatha Stitt, at all times relevant, were duly appointed by, employed by and acting as employees, agents and servants of defendant Ulster, and are sued in both their official and individual capacities. Defendant's principal place of business is Ulster County Courthouse, 275 Wall Street, Kingston, NY 12401.

13.     The individual acts of each of the individual defendants alleged herein were done by the individual defendant, and each of them, under color of law, to wit, under the color and pretense of statutes, ordinances, regulations, customs, policies and usages of the State of New York, the County of Ulster, and the City of Kingston.

14.     At all times relevant, the individual defendants acted in the scope of their employment for defendants Ulster or City.

## FACTS

### A.  Events of February 8, 2014

15.     On February 8, 2014, plaintiffs Angie Callwood, Johnathon Hardaway, and their children A.H. and J.H. were at the Super 8 Hotel in Kingston, New York. Plaintiff Callwood, was the Director of Admissions and Financial Aid for Barrytown College, but did not primarily work on-site. Plaintiff Callwood did attend bi-monthly work meetings in Annandale-on-Hudson, NY near Kingston, NY. That month the family decided to travel to the area together while plaintiff Callwood attended meetings.

16.     At about 5:20 PM, adult plaintiffs left the hotel to pick up food and groceries at nearby stores.  They traveled only a few miles from the hotel and were gone for less than 2 hours. They allowed A.H., who was 12 years old at the time, to babysit her 4 year old brother J.H. in their hotel room.  New York State law allows children age 12 years old and over to babysit if their parents determine that they are sufficiently mature and responsible.

17.     A.H. was a very mature child, responsible and intelligent beyond her years.  In October 2013, A.H. completed a Red Cross babysitting course designed specifically for children 11 years of age and older.  She enjoyed practicing SAT questions online and had correctly answered over 4500 questions at that point, she took several online college courses including a Yale Constitutional Law class, and she went on several college campus tours with plaintiff Callwood.

18.     Given A.H.'s maturity, responsibility, intelligence, and her completion of the Red Cross babysitting course, adult plaintiffs appropriately allowed her to babysit on occasion.  They always made sure that A.H. had a cell phone which was pre-programmed with contacts for both adult plaintiffs, as well as three other adult family members, and a physician who was also a close family friend of sixteen years.

19.     Shortly after adult plaintiffs left the hotel, defendants KPD Officers Michael Mills and Robert Farrell arrived, purportedly in response to a complaint that noise was coming from plaintiffs' room earlier that afternoon.  However, no noise or other complaints were ever made to the plaintiffs and, upon information and belief, there was no loud or disruptive noise coming from the room at any time while plaintiffs were there.

20.     Defendants Mills and Farrell spoke to and obtained a key entry card to plaintiffs' room from hotel clerks.  Defendants Mills and Farrell knocked on the plaintiffs' hotel room door.

Upon information and belief, the two defendants did not identify themselves as police officers. A.H. responded to the knock but she did not open the door as she knew not to open a door for strangers.

21.     Defendants Mills and Farrell opened the door with the key card and entered the room.

22.     This frightened J.H., who ran into the hallway.  Defendant Mills grabbed at J.H., which caused him to fall, then pulled J.H. back into the room by his arm.  Defendant Mills ordered children plaintiffs to sit on the bed and remain still.  The children complied.

23.     A.H. asked the defendants Mills and Farrell to leave several times.  She also told them her age, that she was allowed to babysit, that her father was an attorney, and that their actions were unconstitutional.

24.     Defendants Mills and Farrell ignored A.H.'s requests, confiscated her cell phone, hostilely interrogated her, and searched and ransacked the room.

25.     Upon information and belief, defendants Mills and Farrell then called a private ambulatory care company and requested the company bring children plaintiffs to a local hospital for a medical examination.  This request was made even though there was no reason to remove the children from the room, bring them to a hospital, or have them submit to a medical examination.

26.     Medical records indicate that paramedics arrived and performed a medical examination on children plaintiffs in the hotel room.  Medical records also indicate that the children were healthy; had normal, regular, and strong vital signs; were alert and conscious; and did not appear to be in any pain or distress.

27.     Nonetheless, defendants Mills and Farrell ordered the paramedics to take the children plaintiffs to the hospital for a second medical examination.

28.     A.H. pleaded with the defendants Mills and Farrell to allow her and her brother to stay in the room.  The two officers refused and bullied the children out of the room.  A.H. was forced to leave the room in pajamas without getting dressed, her cellular telephone, or prescription eye wear.  The children plaintiffs were brought to the hospital.

29.     At the hospital, A.H. repeatedly asked to return to the hotel.  Defendant KPD Officer Emily-Claire Sommer stood outside the children's hospital room and told the children they had to remain in the room while the police decided what would be done.

30.     Children plaintiffs were again examined and medical records indicate that they were alert, awake, conversant, in no distress, at healthy weights, and appeared healthy and well groomed.  On a Body Mass Index scale, A.H. was a healthy weight and J.H. was overweight.

31.     Upon information and belief, defendants KPD Sergeant Strand, Mills, and Farrell contacted the NYOCFS State Central Register of Abuse and Maltreatment to gain UCDSS ratification of the removal that already occurred.

32.     According to testimony of defendant Meyer, after the children had already been removed from the hotel and were undergoing a second medical examination at the hospital, one of these defendants called the Central Register and fabricated a phony basis for their removal including stating that A.H. was only 10 years old and J.H. needed immediate medical care because he had a seizure.[a]

33.     There was absolutely no evidence whatsoever that J.H. had a seizure or that either child needed emergency or other medical attention.

---

[a] Defendant Mills would later swear out a criminal complaint falsely claiming A.H. said she "was 12 years old" through the door before he and Farrell entered the room.  Plus, defendant Mills did not reference the phony seizure in the criminal complaint or in any of his four days of subsequent family court testimony.

34.    According to NYOCFS Investigative Progress Notes and defendant UCDSS caseworker James Meyer's handwritten notes, at around 6:15 PM after the plaintiff children were at the hospital, defendant Meyer called and spoke to defendant Strand for less than a minute. Defendant Strand said KPD officers were waiting at the hotel for the parents of the children "a large black man + girlfriend" who were driving a car not registered to them.  Defendant Strand untruthfully asserted KPD did not have plaintiffs' names or contact information.[b]  In addition, no evidence whatsoever has ever been produced that the license plate or car belonged to or was registered to anyone other than plaintiff Hardaway.

35.    Defendant Meyer next called defendant UCDSS supervisor Denise Timbrouck.  He relayed the fraudulent Central Register allegations and defendant Strands' comments.  Defendant Timbrouck ordered defendant Meyer to ratify the removal of the children plaintiffs and to place the children into foster care.

36.    Defendant Meyer later testified that UCDSS ratified the KPD removal in five minutes or less before defendant Meyer even left his home.  Upon information and belief, defendants Strand and Timbrouck never saw the children or the hotel room on 2/8/14 so the removal and UCDSS ratification of the removal was based exclusively on representations made by defendants Mills and Farrell via telephone.

37.    At about 6:30 PM, defendant Meyer arrived at the hotel.

38.    The door to plaintiffs' hotel room was locked so defendants Meyer, Mills, and Farrell used the key card to enter the hotel room.  Hotel staff cleaned the room earlier that day.

39.    Defendant Mills searched the room a second time moving plaintiffs' personal belongings, removing a blanket from the bed, and opening a closed door to the bathroom attached

---

[b] Defendant Mills would later testify, at this point, he knew plaintiffs' names and plaintiff Hardaway's telephone number.

to the room.  Defendant Meyer then took photographs of the room including the bed and the bathroom.  Defendant Meyer then went to the hospital.

40.     When later asked to describe how A.H. and J.H. appeared on 2/8/14, defendant Meyer testified, "Physically they, they appeared clean.  They didn't have any marks or bruises.  They appeared healthy."

41.     Defendant Meyer took A.H. into a hospital room and closed the door to interview her.  A.H. gave defendant Meyer her account of what happened earlier in the hotel room when dealing with defendants Mills and Farrell.  Although defendant Meyer later testified he had plaintiff Hardaway's telephone number by the time of his interview with A.H., defendant Meyer ignored several of A.H.'s requests to call her parents.

42.     The hospital discharged children plaintiffs into defendant Meyer's custody.  Shortly after 8:00 PM, defendant Meyer placed the children into a foster care facility.

43.     In the meantime, at about 7:10 PM on February 8, 2014, adult plaintiffs returned to the hotel and found that their children had been taken.  Needless to say, adult plaintiffs suffered great distress.  No one made a single call to adult plaintiffs while they were away from the hotel that night.

**B.  Section 1028 Application to Return Hearing**

44.     On February 10, 2014, adult plaintiffs filed a § 1028 application to return A.H. and J.H. and a four day hearing ensued on February 10, 11, 13, and 14, 2014.

45.     The Honorable Judge Anthony McGinty presided over all family court matters at the center of this complaint and UCDSS was represented by defendant UCDSS attorney Pamela Joern in those matters.

46.    Plaintiff Hardaway, who is a licensed attorney, represented himself during the application to return hearing.

47.    Judge McGinty gave daily instructions to defendant Joern to allow adult plaintiffs telephone or in-person contact with their children during the hearing.  Defendant Joern ignored Judge McGinty's instructions, for instance, on February 10, 2014, defendant Joern said, "It's virtually impossible." and the next day "We'll schedule a visit, but we have to complete the hearing, Your Honor."  On the third day of the hearing she said, "The problem is that our office is closed, everybody's left."  Defendant Joern prevented adult plaintiffs from hearing A.H.'s account of events until after the hearing ended February 14, 2014.

48.    Defendant Meyer testified that defendant Ulster's policy is not to investigate the countless children twelve years old and younger that live in the County of Ulster and City of Kingston permitted to walk home and stay at home alone unattended (latchkey families) each school day (five days a week) for undetermined lengths of time.  Defendant Meyer later testified in a deposition, Ulster's policy is that "it's up to the parents' discretion" to determine how long to leave a child home alone.  Upon information and belief, City maintains the same policies.

49.    Defendant Meyer manufactured evidence when attributing comments to A.H. that she did not make and suppressed exculpatory evidence when not giving the family court A.H.'s account of what happened on February 8, 2014.

50.    Defendant Mills perjured himself and suppressed exculpatory evidence numerous times during the hearing including claiming KPD tried to call adult plaintiffs but they were unreachable, A.H. appeared not to know her parents' telephone number, and A.H. appeared afraid

to call her parents even once.[c]

51.     Defendant Mills also dishonestly testified plaintiff Hardaway's car, a silver Porsche Cayenne, was registered to two individuals with names of apparent Asian descent.

52.     On February 14, 2014, the family court ordered the children be immediately returned to adult plaintiffs.  The court set a pre-hearing date for a neglect trial based on a 2/10/14 UCDSS neglect petition signed by defendant UCDSS Commissioner Michael Iapoce.  The court also issued a protective order requiring A.H.'s schooling be compliant with state education law during the pendency of all family court matters.

### C.  Violation Petition and § 1027 Emergency Removal Petition

54.     At all times relevant, plaintiffs directly and through counsel assured defendants they were compliant with the protective order and A.H.'s schooling was compliant with New York State education law.

55.     NYOCFS Investigative Progress Notes state that when returning the children to adult plaintiffs on 2/14/14, defendant Greene instructed a UCDSS caseworker "to interview parents as well as get them to sign releases."  When that caseworker met the adult plaintiffs in a parking lot to return children plaintiffs, adult plaintiffs and the caseworker had a disagreement that lasted about twenty minutes.  The caseworker refused to return children plaintiffs unless adult plaintiffs agreed to fill out nineteen pages of forms and releases including: (a) a consent for release of educational information for A.H., (b) medical HIPAA release forms for children plaintiffs, (c) general information release forms for adult plaintiffs, and (d) a fourteen page New York State Application for Temporary, Medical, Foster Care, and Food Stamps Assistance.  The application

---

[c] On July 8, 2014, during a neglect trial, defendant Mills testified that A.H. knew her parents' telephone number and tried to call it several times.  On the next day, defendant Farrell testified A.H. had a cellular telephone and tried to call her parents several times using the phone.  Telephone records indicate plaintiffs were never called.

was for assistance plaintiffs neither wanted nor were qualified to receive.  The children were ultimately returned without the forms being completed.

56.     Thereafter, defendant Greene insisted adult plaintiffs enroll A.H. in a New York school and fill out the nineteen pages of forms.  In a February 24, 2014 email, she wrote to plaintiff Hardaway "your failure to enroll [A.H.] in a school program in a timely fashion, which means immediately, will result in the filing [of] a Violation Petition against you and your wife."  In an email dated March 3, 2014, defendant Greene threatened to file a violation petition "since [plaintiff Hardaway] refused to sign a release or provide documentation" of compliance with the protective order.   The next day, defendant Greene filed a violation petition claiming defendants were noncompliant with the protective order.  Defendant Iapoce signed the violation petition.

57.     On March 25, 2014 at a pretrial hearing for the neglect trial, the family court decided the violation petition would be heard during the trial in July and August 2014.[d]  At that hearing and at other hearings, defendant Joern was untruthful with the family court about plaintiffs' compliance with the protective order and on other topics.

58.     Defendant Joern and eight other UCDSS personnel posted adult plaintiffs' mugshots on Facebook and took turns disparaging them and "liking" each other's negative comments.[e]  Defendant Joern also mischaracterized the results of the application to return hearing, disclosed confidential information about plaintiffs she obtained from the family court application to return hearing, and stated, although the family court returned the children to adult plaintiffs on 2/14/14, "We'll see."  She deleted electronic versions of her Facebook posts after plaintiffs learned they existed.[f]

---

[d] On August 13, 2014, the violation petition was dismissed at the conclusion of the neglect trial.
[e] UCDSS and defendant Ulster maintain policies against disclosure of confidential information.
[f] The KPD Facebook account posted adult plaintiffs' mugshots with defendant Mills' falsehoods. Subsequently, Facebook users denigrated plaintiffs.  The post was also subsequently deleted.

59.     According to NYOCFS Investigative Progress Notes, on April 7, 2014, defendants UCDSS Deputy Commissioner Barbara Sorkin, UCDSS caseworker Peggy Webb, Joern, and three other UCDSS personnel met.  Participants discussed the issues in the family court case.  "[N]oted was the fact that these already-raised issues would not be heard in court until July and August [2014]."  Participants agreed to file an emergency removal petition for A.H. to circumvent the trial. When supplying plaintiffs with discovery, defendant Joern redacted only this one NYOCFS Investigative Progress Notes entry out of one hundred and forty-six entries.  Upon information and belief, by deleting the Facebook post and redacting this entry, defendant Joern tried to hide malfeasance.

60.     UCDSS investigators prepare emergency removal petitions.  At a June 4, 2014 deposition of defendant Webb, defendant Joern explained defendant Webb could not prepare a 4/7/14 emergency removal petition because defendant Webb was not a UCDSS investigator. Defendant Joern went on to state she prepared the 4/7/14 emergency removal petition.

61.     On April 8, 2014, plaintiff Hardaway learned of the emergency removal petition when defendant Webb called plaintiff Hardaway.  She told him not to come to the hearing and to consent to a removal of A.H.  At the time of the call, defendants knew unequivocally plaintiffs were represented by counsel.  The call was recorded in NYOCFS Investigative Progress Notes.

62.     At the 4/8/14 hearing, defendant Joern claimed that the reason for the emergency removal petition was A.H.'s homeschooling plan was not registered in the Kingston City School District.  This supposed urgent registration requirement was not an "already-raised issue" since it was unmentioned in the two months of prior family court litigation.

63.     The family court instructed adult plaintiffs to register A.H.'s homeschool plan with the Kingston City School District.  Judge McGinty stated he relied exclusively on defendant

Joern's untruthful assertion that homeschooling registration in the Kingston City School District was required for A.H.  The Kingston City School District refused to register A.H. because she was not a resident of the City of Kingston.

64.     Defendant Joern knew A.H.'s homeschooling plan could not be registered with the Kingston City School District since plaintiffs did not reside in the Kingston City School District. In fact, defendant Joern admitted on April 11, 2014 in a letter to adult plaintiffs' attorneys, it was "Obvious, the Kingston City School District is not going to allow a parent to enroll a child who does not currently live in the school district."  Also, pursuant to NY FCA § 1027, emergency removal of a child must address "imminent risk to the child's life or health" which homeschooling non-registration would not be even if it were required.

**D.  Neglect Trial Based on UCDSS 2/10/14 Neglect Petition**

65.     The neglect trial against adult plaintiffs took place over the course of two months in July and August 2014.

66.     Despite the defendant Ulster's policy against investigating or prosecuting latchkey families and allowing parents to decide how long to leave their children home alone, the entire neglect trial was about the time adult plaintiffs were away from the hotel supposedly being too long and whether adult plaintiffs ignored calls when away from the hotel on 2/8/14.

67.     As plaintiff Hardaway's attorney pointed out on the record, defendant Mills laughed during much of his neglect trial testimony.  Upon information and belief, he did so to show his malice for the plaintiffs and lack of respect for the court proceeding.

68.     Defendants Mills' July 2014 trial testimony was also different from his February 2014 application to return hearing testimony in several substantive ways. For example, at trial he claimed that adult plaintiffs were away from the hotel for several more hours than they were, he

attributed false statements to A.H. that contradicted prior statements he attributed to A.H., and he contradicted his own prior testimony in other noteworthy ways.

69.     Defendant Meyer's trial and application to return testimony contained similar significant contradictions.  He also continued to hide exculpatory evidence by claiming that A.H. did not tell him anything that happened while defendants Mills and Farrell were in the hotel room. During defendant Meyer's testimony, defendant Joern tried to introduce into evidence a document purportedly prepared by defendant Meyer which was either withheld during discovery or created after plaintiffs received discovery.  There is also circumstantial evidence that defendants Joern and Meyer withheld other exculpatory evidence during discovery.

70.     Defendant Farrell admitted that he and defendant Mills discussed their testimony prior to defendant Farrell testifying.  As noted by plaintiff Hardaway's attorney on the record, both defendants uttered some of the exact same phrases during their separate testimony.  Defendant Farrell acknowledged A.H. had a cellular telephone.

71.     During her closing argument, defendant Joern made it clear that UCDSS's case relied completely on the false testimony supplied by defendants Mills, Meyer, and Farrell.

72.     On August 13, 2014, Judge McGinty dismissed the 2/10/14 neglect petition and the 3/4/14 violation petition.

**E.  Criminal Proceedings Against Adult Plaintiffs**

**a.  UCDAO Prearrest Investigation**

73.     On February 13, 2014 at 9:00 AM in the Ulster County family court courthouse at 16 Lucas Avenue, Kingston, NY prior to that day's application to return hearing, defendants UCDAO investigator Tamatha Stitt, UCDAO Assistant District Attorney Culmone-Mills (on that day in a romantic relationship with defendant Mills and married to him on 10/11/14), Greene,

Meyer, and other defendants met.  Defendant Stitt told meeting participants that after multiple discussions it was determined "nothing seems to be adding up" about adult plaintiffs so they would be arrested for child endangerment.  In the meeting, Stitt also claimed that plaintiff Hardaway had two telephone numbers, one being used by an escort service and one a pornographic web site.  The specifics of the meeting were captured in NYOCFS Investigative Progress Notes.

74.     After the 9:00 AM meeting, defendant Stitt, who "investigated" adult plaintiffs on behalf of the UCDAO and UCDSS, testified at the application to return hearing.  Her testimony summarizes her investigation.

75.     Defendant Stitt testified that she was asked to begin her investigation at 4:30 PM on February 12, 2014 after plaintiff Hardaway cross examined defendants Meyer and Mills.  She testified her so called investigation consisted entirely of one and one half hours of internet searches on *only* plaintiff Hardaway.

76.     Defendant Stitt falsely testified on direct examination that the *only* information she found during her investigation was that plaintiff Hardaway had a telephone number used by an escort service and she could not confirm that plaintiff Hardaway was an attorney.[g]

77.     In fact, plaintiff Hardaway is licensed to practice law in New York and in Washington D.C., he is gainfully employed as a lawyer and sports agent, and neither he nor his telephone number were ever connected in any way to any escort service or illicit business.

78.     Upon information and belief, defendant Stitt's goal was to imply that plaintiff Hardaway was not gainfully employed as an attorney but instead the owner of an escort service or illicit business.

---

[g] Moments before the hearing during the 9:00 AM meeting, defendant Stitt said plaintiff Hardaway had two phone numbers affiliated with illicit businesses but testified that plaintiff Hardaway had only one.

79.    Defendant Stitt's testimony was contradicted by the very documents she brought into the hearing which she handed to plaintiff Hardaway during cross examination.

80.    Defendant Stitt guaranteed the court multiple times that the information she provided about plaintiff Hardaway having a telephone number used by an escort service was accurate.  She testified the information came from an internet search tool she used in hundreds of cases over twenty seven years (since 1987) but the company was founded in 2004.  She testified that the internet search tool was a "database that police agencies" used but the printout for the search tool defendant Stitt utilized states the "PERMISSIBLE PURPOSE" for the tool is "Collections" at the top of the printout.   The guidelines for the internet search tool company state: "For a business to be eligible [to use this internet search tool], it must be one of the following types: private investigation agency, repo agency, registered process server, collection law firm or financial institution."  To get around these guidelines, UCDAO made up a fictitious detective agency called the "Blue Moon Detective Agency" which appears at the top of defendant Stitt's printouts. Defendant Stitt misspelled plaintiff Hardaway's name when doing the search.  She did not conduct any independent verification of her escort service claim and had no plans on calling the telephone number.  The printout also states the following warning:

> **DATA WARNING:** Information contained herein is derived from records that may have errors and/or not always be accurate or complete.  Data is sometimes entered poorly, processed incorrectly and may not be free from defect.  This system should not be relied upon as definitively accurate.  Before relying on any data this system supplied, it should be independently verified.
> (bold in original)

81.    Defendant Stitt first dishonestly claimed she found no biographical information about plaintiff Hardaway like the fact he graduated the University of Chicago Law School, Carnegie Mellon University MBA business school, and Howard University undergraduate school during her investigation.

Q (PLAINTIFF HARDAWAY): So if you go to Facebook and Google me, you don't find University of Chicago law degree?
A (DEFENDANT STITT):  No.
Q. You don't find Carnegie Mellon MBA?
A. No.
Q. You don't find Howard University undergrad?
A. No.  Mr. Hardaway, I had literally an hour and a half to research you.

82.    Defendant Stitt admitted she had plaintiff Hardaway's National Football League Players Association registered sports agent biography in her possession which included educational information such as the three universities plaintiff Hardaway graduated, his physical addresses, his telephone and fax numbers, and various services he offered pro athletes.

Q (PLAINTIFF HARDAWAY): You said none of the documents had anything to do with me going to Howard University.
A (DEFENDANT STITT): I didn't say that.

Q (PLAINTIFF HARDAWAY): Did any of the documents say I was a Howard undergrad?
A (DEFENDANT STITT): I saw Howard University on there; I don't know what it said.

Q (PLAINTIFF HARDAWAY): You said none of the documents - - Did any of the documents say I went to University of Chicago Law School?
A (DEFENDANT STITT): Yes.
Q: Did any of the documents say I have a Carnegie Mellon MBA?
A: Yes.

83.    Defendant Stitt first testified plaintiff Hardaway's "Facebook page appears to have absolutely nothing on it; the Twitter page has nothing on it."  Curiously, defendant Stitt did not bring a printout of plaintiff Hardaway's Facebook webpage.  Plaintiff Callwood accessed plaintiff Hardaway's Facebook webpage during the hearing and showed defendant Stitt.  There was a record of Facebook posts dating back to March 2009.  The webpage included plaintiff Hardaway's picture, education including the three universities plaintiff Hardaway graduated, his physical and email addresses, his date and place of birth, his telephone and fax number, and the URL for his

sports agency and law firm.  The URL contained detailed information about plaintiff Hardaway including a two page biography.

84.     Similarly, defendant Stitt admitted plaintiff Hardaway's Twitter webpage printout which she brought to court contained his picture, telephone number, email address, physical address, his status as a sports agent and attorney.  The twitter page was started in March 2009.

85.     She was confronted on cross examination with a printout of plaintiff Hardaway's New York State bar profile which included his law school, email, physical address, and telephone number.   Afterwards, defendants Stitt and Joern retorted on re-direct examination "licensed attorneys have engaged in illegal activities" too.

86.     When asked whether she found any news articles about plaintiff Hardaway. Defendant Stitt first stated emphatically "No." during cross examination.  Later, she admitted she found news articles.  When asked if she had seen a February 7, 2014 article written about plaintiff Hardaway negotiating a NFL contract that day she replied "I don't think it has any bearing on what we're doing here."

87.     She hid proof of plaintiff Hardaway's involvement in Christian and youth camps.

88.     Defendant Stitt confessed that information she withheld from UCDAO, UCDSS, and the family court reflected positively on plaintiff Hardaway and his reputation.

89.     Although defendant Stitt first claimed she had only conducted internet research, she swore she had also sent out subpoenas, would send out more subpoenas, and "we have a lot of things that we need to check out."  Even so, adult plaintiffs were arrested moments after she testified and, during criminal and family court discovery, were given no evidence by UCDAO or UCDSS from her investigation.

90.     Defendant Stitt's fabrication and suppression of exculpatory evidence was completely contrary to her testimony that the goal of her investigation was to find out whether plaintiff Hardaway was a "legitimate person, capable of taking care of children."

91.     Even after the hearing and adult plaintiffs' arrests, defendant Stitt continued to manufacture evidence, hide exculpatory evidence, and falsely assert that the plaintiffs were involved in illicit businesses.

92.     Plaintiff Callwood is an Unificationist, Barrytown College is an Unificationist college, and plaintiff Hardaway once rented an apartment in Manassas, VA.

93.     NYOCFS Investigative Progress Notes summarize a February 20, 2014 telephone conversation between defendants Greene and Stitt.  Defendant Stitt asserted Manassas, VA "has a notorious sex trafficking issue being run by orientals and believed to be part of the Moonie cult"; this "explained why [plaintiff Hardaway was driving] a Porsche" which defendant Mills claimed was registered to someone of Asian descent.  Upon information and belief, not only did defendant Stitt communicate this false information to UCDSS but also UCDAO.

94.     The terms "orientals" and "Moonie cult" are derogatory terms used to describe Asians, members of the Unification religion, and the Unification religion itself.

95.     Defendant Stitt disclosed to defendant Greene that she contacted the "head of the task force" in charge of sex trafficking in Virginia.  She told that person plaintiffs "were likely involved in sex trafficking and other crimes" and should be questioned by Virginia authorities.

96.     Defendant Stitt admitted to calling plaintiff Callwood's employer multiple times with no purpose other than to see if she was there.  Upon information and belief, defendant Stitt was trying to humiliate plaintiff Callwood and cause her to lose her employment.

97.     Defendant Stitt also falsely asserted plaintiff Callwood once owned a business that currently had a URL with "179 various graphic porn sites."

98.     Upon information and belief, at the time of her 2/20/14 conversation with defendant Greene, defendant Stitt confirmed, but failed to disclose to UCDAO or UCDSS, that plaintiff Callwood graduated Cornell University MBA business school, Syracuse University undergraduate school, and was a well-regarded alumnus of both schools known to be of high moral character.

### b. False Criminal Complaint and Other Perjury by Mills Forwarded To and Evidence Hidden From UCDAO and UCDSS

99.     On February 13, 2014, defendant Mills swore out a criminal complaint against adult plaintiffs which was inconsistent with the truth, facts, and evidence.  Defendants KPD detectives Timothy Bowers and Richard Negron also attested to the criminal complaint.  In hearings in February and July 2014, defendant Mills was also untruthful.  The following are examples of defendant Mills' written and testimonial perjury:

A. He testified that, after the phony Central Register call was made, it took defendant Meyer two hours to arrive to the hotel.  If defendant Mills is to be believed, the Central Register call was made before KPD was supposedly called.  In truth, it took defendant Meyers thirty minutes or less to arrive.

B. He testified to a timeline where he and Farrell were dispatched to the hotel by KPD, drove to the hotel, spoke with hotel staff, knocked on the hotel room door for fifteen minutes, and entered the hotel room which placed him in the hotel room before it is alleged KPD received a call.

C. His testimony regarding the time that adult plaintiffs returned to the hotel was wildly inconsistent in the criminal complaint and family court testimony.  In February 2014, he testified that adult plaintiffs returned at 9:00 PM.   In July 2014, he testified they returned at 11:00 PM or later.  Adult plaintiffs returned at about 7:10 PM.

D. He first testified his shift began at 4:00 PM, in later testimony at 3:40 PM, and, when swearing out a criminal complaint after testifying, at 3:00 PM. Upon information and belief, defendant Mills contrived shift times to supplement whatever perjury he was giving at the particular moment.

E.  He often attributed false statements to witnesses.  For instance, in February 2014, he testified A.H. "said, "My parents are gone; they just left a few minutes ago; they'll be back in a few minutes.  They just went to get a few things from the store."  In July 2014, defendant Mills testified, "She said they left a long time ago.""

F.  He testified J.H. was about two feet shorter to support a falsehood that "there'd be a possibility that [if J.H.] pulled on the cord the item [a hair curler on a sink in the hotel room] could strike him in the head."

| Defendant Mills' Testimony of J.H.'s Height | Picture of J.H. Barefoot on 2/15/14 |
|---|---|
| Q (PLAINTIFF HARDAWAY): Could you please use your finger to point to where you think he would be at on the picture.<br>A (DEFENDANT MILLS): As I said before, his head would be below this wood piece, that's below the sink.<br>(JUDGE MCGINTY): Show me.<br>(DEFENDANT MILLS):  His head would come up to approximately right below this.<br>(JUDGE MCGINTY):  Indicating for the record an area of the top image where the color fades from brown to black. | Compare defendant Mills' claim, the checker board arrows in both pictures, with actual height of J.H., the solid arrow in the below picture.  The hair curler referred to by defendant Mills is in the oval in the first picture.<br> |
|  | |

G.  In February 2014, he testified A.H. appeared to "be afraid to call" her parents even once.  In July 2014, he and defendant Farrell testified A.H. had no problem calling her parents several times.

H.  He first testified that A.H. was being untruthful about plaintiff Hardaway's name so he asked hotel clerks who was the registered guest and the hotel clerks provided plaintiff Hardaway's name and telephone number.  Defendant Mills later testified the hotel staff said the registered guest was someone other than plaintiff Hardaway.

I.   He first testified the paramedics insisted the children be brought to the hospital and unilaterally decided to remove the children because they were in poor condition.

J.   He swore in a criminal complaint that defendant Meyer made the removal decision while in the hotel room at 6:00 PM with the children and thereafter defendant Meyer stayed in the hotel room for one hour and twenty minutes.

K.   He testified that defendant Meyer was present while the paramedics medically examined the children plaintiffs while all were in the hotel room; the paramedics and defendant Meyer jointly made the decision to remove the children; and defendant Meyer, the paramedics, and the children went to the hospital.[h]

L.   He testified that he did not see a hotel key card in his or defendant Farrell's possession.

M.   Although there is ample evidence, he and Farrell used a key entry card to enter the hotel room twice, in February 2014, defendant Mills testified in a family court hearing and swore in a criminal complaint that A.H. opened the door for him.  He testified to multiple, distinctive stories of what was said and done to convince A.H. to open the door.  When key details of a February 2014 story conflicted with a July 2014 story, defendant Mills was read his testimony from his February 2014 story.  Afterwards, he testified the key details in the February 2014 story were "not true."

N.   In February 2014, he testified A.H. was given an opportunity to put on clothes but chose to leave the hotel room in pajamas.  In July 2014, defendant Mills testified that A.H. was given an opportunity to dress and decided to take clothes with her when leaving the hotel room.

O.   Apart from the above referenced instances of perjury, his sworn criminal complaint and family court testimony contained several other important falsities including but not limited to times of occurrences involving plaintiffs and others; how long defendants Mills and Farrell were in the hotel room and what they did and said while in the hotel room; whether and the number of times he and KPD attempted to contact the adult plaintiffs; whether he and Farrell searched the room or moved any items in the hotel room; the condition of the hotel room; whether he remained inside the hotel room with the door open or left the room and re-entered using a hotel key card a second time; his interactions with A.H.; the physical and mental conditions of children plaintiffs; his conversations with the hotel staff; the time the adult plaintiffs were away from the hotel; and whether plaintiff Hardaway was the registered owner of plaintiff Hardaway's car.

---

[h] Neither of the versions in paragraph 99.J. or 99.K. were or could be true.  Not only because defendant Meyer would have to be in two places at once but also because the children plaintiffs were undergoing a second medical examination in the hospital before defendant Meyer left his home.

### c.  UCDAO Involvement in Criminal Investigation and Witness Coaching

100.    Defendants Bowers, Negron, and Culmone-Mills, were present at the February 13, 2014 application to return hearing.  Before the start of the hearing and during breaks: defendant Culmone-Mills made recommendations to defendant Mills as to how he should answer questions during cross examination; Culmone-Mills discussed fact patterns in case law involving child removals with defendant Mills; and defendants Culmone-Mills, Bowers, Negron, Mills, and Joern discussed their impressions of hearing testimony.  These interactions took place before adult plaintiffs were arrested, interrogated, and charged by UCDAO.

### d.  False Arrests of Adult Plaintiffs

101.    On February 13, 2014 at approximately 1:15 PM, as adult plaintiffs were exiting a courtroom in the Ulster County family court courthouse, they were arrested after UCDSS rested its case.  Both adult plaintiffs were charged with two counts each of New York Penal Law Article § 260.10 Endangering the Welfare of a Child.

102.    Just prior to their arrest, plaintiff Hardaway cross examined defendants Mills, Stitt, Meyer, and Greene at the application to return hearing.

103.    When plaintiff Callwood asked defendant Bowers what she was being arrested for, he responded, "Ask your husband.  He is the big mouth lawyer that has so much to say."  Defendant Bowers claimed defendant Strand participated in the arrest.

104.    As defendant Mills handcuffed plaintiff Hardaway, defendant Mills said, "Dirty, uppity nigger.  You got any questions for me now?"

105.    The plaintiffs are African-American.

106.    Adult plaintiffs were interrogated multiple times.

107.    When plaintiff Callwood asked for plaintiff Hardaway to be brought into her interrogation as her attorney, defendant Negron laughed and responded, "Honey that is what landed your ass here in the first place."

108.    Defendant Negron told plaintiff Hardaway that adult plaintiffs would be released after their fingerprints were run through various databases.[i]  After adult plaintiffs fingerprints came back as having no criminal records, defendant Negron said defendant Culmone-Mills preferred adult plaintiffs spend the night in jail and see a judge in the morning.

109.    During their incarceration, adult plaintiffs were treated despicably.  Upon information and belief, this is proof of defendants' malice for plaintiffs.  When plaintiff Hardaway passed out during booking, defendant Bowers said, "He is faking it."  At all relevant times, plaintiff Hardaway had an aortic dissection of 5.5 centimeters, blood pressure that had been measured over 225 systolic on multiple occasions, and took three blood pressure medications thrice daily.  If not properly medicated, plaintiff Hardaway could suffer a stroke or die.  Plaintiff Hardaway made three separate emergency room visits in September, October, and December 2013 when he had ailments related to his blood pressure.  Plaintiff Hardaway disclosed the urgent need for either blood pressure medication from his belongings or medical attention to defendants Mills, Bowers, Negron, and two unidentified KPD police officers that acted as jailers.  Plaintiff Hardaway was not given his medication or medical attention.  Although she demanded adequate sanitary napkins several times, plaintiff Callwood was not given them.

110.    Upon finally seeing a judge, adult plaintiffs were released on their own recognizance on February 14, 2014.

---

[i] According to NYOCFS Investigative Progress Notes, just before the arrest, "KPD reported that the parents will not be released until the results of their fingerprints have come back."

**e.    Defendant Greene Confirms Arrests Were To Find Out Who Adult Plaintiffs Were and Racial Bias in Defendants' Decision-Making Criteria**

111.    On February 14, 2014, after the family court ordered UCDSS to return children plaintiffs to adult plaintiffs, defendant Greene unexpectedly confronted adult plaintiffs in the courthouse parking lot and followed them to their car.  In a June 4, 2014 deposition, defendant Greene would claim she, "went out to help start getting the [adult plaintiffs'] car out of the snow before they came out and could not find the silver Porsche,[ so she] had to wait for them to come out and that's when he [plaintiff Hardaway] said, no, it's a blue Ford Focus, so I said I thought you were driving a Porsche."

112.    On that day, defendant Greene stated, "You should only drive this car [referring to the Ford Focus] while you are in Kingston.  Driving luxury cars [referring to plaintiff Hardaway's Porsche] will get you the kind of police attention you do not want in Kingston." and "You were arrested so that we could find out who you were.  Nobody could figure out who you all were."[j]

113.    Moreover, on June 4, 2014, defendant Greene testified that plaintiff Hardaway's decision to drive multiple cars sent a signal to UCDSS "that there doesn't seem to be a lot of stability with [plaintiffs'] family."  But if Judge McGinty were to drive multiple cars it would not send the same signal of instability.

> Q (PLAINTIFF HARDAWAY'S ATTORNEY):  Hypothetically let's say if, I don't know, Judge McGinty drove one car one day and then came to court another day with another car, does that indicate to you that there's a lack of stability?
> A (DEFENDANT GREENE): No.

---

[j] Defendant Greene testified she was present in the pre-arrest meeting where defendant Stitt said "nothing seems to be adding up" and "KPD reported that the parents will not be released until the results of their fingerprints have come back."

### f.  Criminal Prosecution Ends Favorably for Adult Plaintiffs

114.     After the original arraignment, the criminal court case was put on hold during the pendency of the family court case.

115.     On August 13, 2014, immediately following the dismissal of all family court matters, a letter was sent asking UCDAO to withdraw its criminal court charges.  Subsequently, defendant UCDAO Ulster County District Attorney Holley Carnright reviewed the family court transcripts and met with subordinates at least twice.

116.     On October 31, 2014, the criminal charges against adult plaintiffs were voluntarily dismissed by UCDAO.

## F.  County of Ulster and City of Kingston Policies, Supervision, and Training

117.     NYOCFS statistics on UCDSS removals rose from January to April 2014 with more children taken by UCDSS in those months than in all of 2013.  A June 4, 2014 Daily Freeman news article titled Ulster County foster care numbers rising dramatically states the sharp increase in the number of children removed was considered a dramatic increase by defendant Sorkin.  Defendant Joern remarked during a June 4, 2014 deposition of defendant Webb, "We do so many of them [emergency removal petitions] it's hard for me to recall specifically which ones I've done".  Defendants knew to a moral certainty and it was a highly predictable consequence that defendants would have to properly apply the emergency removal statutes.

118.     Pursuant to NY FCA §§ 1022 and 1027, in order for a child to be removed from a parents custody in New York, the removal must address an "imminent risk to the child's life or health"; § 1024 must address "imminent danger to the child's life or health".  Under NY FCA § 1024(b)(iii), when a social services agency removes a child, notice must be left and "Such notice shall also include the name, title, organization, address, and telephone number of the person

removing the child." In addition, NYOCFS guidelines state, "During the course of child protective services investigations specific notifications are required by law and regulation to protect the interests of the child, the family, the investigative agency and other agencies involved with protective services." Defendant Ulster's § 1024 notice does not require caseworkers to provide their contact information.[k]

> Q (PLAINTIFF HARDAWAY'S ATTORNEY): When you left the hotel, did you provide a way for Mr. Hardaway or Ms. Callwood to contact you directly?
> A (DEFENDANT MEYER): No.
> Q: You indicated that you left some sort of notice on the door. Did you tape it to the door, or did you affix it in some other way?
> A: I affixed it, I put it in the door another way.
>
> Q (PLAINTIFF HARDAWAY'S ATTORNEY): What was your plan, if at all, for the Hardaways to be able to contact someone to find out where their children were?
> A (DEFENDANT MEYER): I had intended on reaching out to them the following morning.

119. In *Treistman v. Wacks*, 1:12-cv-1897 (NDNY 2014), the plaintiff in Treistman made a Central Register allegation that the mother of his seven year old daughter was neglectful. He alleged the mother left their daughter home alone; the child locked herself out of the apartment and, subsequently, the apartment building; the child wandered into the parking lot and highway crying and shouting; the child was found by a neighbor. In keeping with UCDSS's policy on latchkey children, defendant Greene determined that these facts were not evidence of neglect.

120. Treistman alleged that in retaliation for his Central Register call and for other illegitimate reasons defendants Greene and Sorkin and others interfered with his Constitutional right to parent-child familial association; used legal process including a restraining order and neglect petition in an unlawful manner to force plaintiff to discontinue a long list of plaintiff's

---

[k] Importantly, defendant Meyer testified that if he had spoken to either of the adult plaintiffs he would have requested a reconsideration of the UCDSS ratification of the KPD removal.

lawful parenting choices and to influence a collateral custody proceeding; and caseworkers, including defendant Greene, perjured themselves in hearings to obtain that unlawful legal process.[l]

121.    Likewise, in the case at bar, defendants Greene, Sorkin, and other Ulster personnel used legal process including one violation petition, one neglect petition, one indication, two emergency removal petitions, and one criminal action in an unlawful manner.  Defendants also used perjury and other deception at every stage of family and criminal court proceedings.

122.    On February 15, 2014, during a UCDSS home visit the day after the children plaintiffs were reunited with adult plaintiffs, plaintiff Hardaway voiced his unhappiness with the illegal entry into his family's hotel room on 2/8/14.  In response, Ulster County Police Department Sergeant James Gramoglia gave his understanding of defendants City's and Ulster's policy and practice on entry into private abodes without a search warrant.  As established by NYOCFS Investigative Progress Notes, Gramoglia "explained that contrary to what one might see on television, Law Enforcement does not necessarily need a warrant to enter the premises during an investigation."

123.    Defendants' Fourth Amendment and Due Process abuses include: twice entering and twice searching plaintiffs' hotel room; twice questioning A.H.; twice medically examining children plaintiffs; removing children plaintiffs from adult plaintiffs' custody; imprisoning all four plaintiffs; filing an extortive violation petition; filing a baseless emergency removal petition to remove A.H. from adult plaintiffs for homeschooling registration; and bearing false witness in family and criminal court.

---

[l] Plaintiff Treistman also alleged defendant Greene threatened to have him imprisoned.

**SUMMARY**

124.    Plaintiffs Callwood, Hardaway, and their children were dragged through over 15 hours and 20 days of hearings, 7 months of family court litigation, 9 months of criminal court litigation, 27 intrusive UCDSS home visits, the children spent 7 days in foster care, the parents 1 day each in jail, and A.H. underwent 31 UCDSS interviews.  Plaintiffs' lives were disrupted.  The family was embarrassed and put under great stress.  Plaintiffs incurred thousands in attorney's fees, court costs, and travel expenses all based on unsupported and false allegations, bigotry, perjury, hidden exculpatory evidence, and manufactured evidence.  Plaintiff Callwood has found it impossible to find new employment based on her mugshot and news articles about her arrest being on the internet.  Children plaintiffs were forced to endure a situation that no child should, particularly when the children are as loved and well cared for as these children.

**FIRST CAUSE OF ACTION: 42 U.S.C. § 1983 FOURTH AMENDMENT ILLEGAL ENTRY AND SEARCH WHILE A.H. AND J.H. WERE IN HOTEL ROOM**
(*against defendants Mills and Farrell*)

125.    Plaintiffs repeat the allegations contained in paragraphs 1 through 124.

126.    As alleged above, defendants entered and searched plaintiffs' hotel room and A.H.'s cellular telephone without a search warrant, probable cause, consent, and in the absence of exigent circumstances.  Defendants' entry violated plaintiffs' Fourth Amendment right to be secure from unlawful entry into their home and secure from a search of their home and cellular phone.

**SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 FOURTH AMENDMENT ILLEGAL ENTRY AND SEARCH WHILE HOTEL ROOM WAS VACANT**
(*against Strand, Mills, Farrell, and Meyer*)

127.    Plaintiffs repeat the allegations contained in paragraphs 1 through 126.

128.    As alleged above, defendants entered and searched plaintiffs' hotel room without a search warrant, probable cause, consent, and in the absence of exigent circumstances.  Defendants'

entry violated plaintiffs' Fourth Amendment right to be secure from unlawful entry into their home and an unlawful search of their home.

### THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 FALSE IMPRISONMENT OF CHILDREN PLAINTIFFS
*(against defendants Strand, Mills, Farrell, Sommer, Timbrouck, and Meyer)*

129.    Plaintiffs repeat the allegations contained in paragraphs 1 through 128.

130.    As alleged above, defendants intended to and did confine children plaintiffs in the hotel room and then in the hospital room; children plaintiffs were conscious of their confinement, did not consent to it, and did not reasonably believe they were free to leave; and the confinement was in no way privileged.

### FOURTH CAUSE OF ACTION: 42 U.S.C. § 1983 MEDICAL EXAMINATION OF CHILDREN PLAINTIFFS IN HOTEL BY PARAMEDICS
*(against defendants Strand, Mills, Farrell, and Sommer)*

131.    Plaintiffs repeat the allegations contained in paragraphs 1 through 130.

132.    Adult plaintiffs have a protected liberty interest in directing the medical care of their children.  The medical examination ordered by defendants by paramedics was a direct violation of plaintiffs' Due Process rights.  Defendants ordered the examination in retaliation for A.H.'s admonishment of defendants' unconstitutional acts, to cover up those acts, and to create a fiction that the children needed medical care.  Defendants were without consent, probable cause, court order, and any belief that exigent circumstances or conditions presented a danger to children plaintiffs that would require a medical examination.

### FIFTH CAUSE OF ACTION: 42 U.S.C. § 1983 FOURTH AMENDMENT UNLAWFUL-SEZIURE REMOVAL CHILDREN PLAINTIFFS FROM ADULT PLAINTIFFS' CARE
*(against defendants Strand, Mills, Farrell, Sommer, Timbrouck, and Meyer)*

133.    Plaintiffs repeat the allegations contained in paragraphs 1 through 132.

134.    The integrity of the family unit is a constitutional right protected by the Due Process Clause of the Fourth Amendment.  Pursuant to Due Process guarantees under the Fourteenth Amendment, adult plaintiffs have a protected liberty interest in the uninterrupted care and custody

of their children.  Children plaintiffs have a protected liberty interest in the care and guidance of their parents.  Defendants deprived plaintiffs of their constitutional rights when defendants removed children plaintiffs from adult plaintiffs' custody and care.  The seizure had no lawful basis and was used to retaliate and cover up wrongdoing.  The seizure itself was carried out in an unreasonable manner, like a kidnapping, with the children being forced out of the hotel room in pajamas.  The seizure was endured for an unreasonable length of time, seven days, and burdened children plaintiffs' interest in being in the care and custody of their parents.  Defendants were without consent, probable cause, court order, and belief that exigent circumstances or conditions presented a danger to children plaintiffs that would allow for removal.

## SIXTH CAUSE OF ACTION: 42 U.S.C. § 1983
## FOURTH AMENDMENT SEIZURE INTERVIEW OF A.H.
(*against defendants Strand, Mills, Farrell, Sommer, Timbrouck, and Meyer*)

135.    Plaintiffs repeat the allegations contained in paragraphs 1 through 134.

136.    The custodial interview of A.H. in the hotel room and hospital room by defendants Meyer, Mills, and Farrell constituted an unlawful Fourth Amendment violation seizure. Defendants were not justified because there was no reasonable cause or other legal justification to suspect A.H. was neglected or abused at the time she was seized and interviewed.

## SEVENTH CAUSE OF ACTION: 42 U.S.C. § 1983 FOURTH AMENDMENT SEZIURE
## MEDICAL EXAMINATION OF CHILDREN PLAINTIFFS IN HOSPITAL
(*against defendants Strand, Mills, Farrell, Sommer, Timbrouck, and Meyer*)

137.    Plaintiffs repeat the allegations contained in paragraphs 1 through 136.

138.    Adult plaintiffs have a protected liberty interest in directing the medical care of their children.  The second medical examination ordered by defendants by the hospital was a direct violation of plaintiffs' Due Process rights.  Defendants ordered the examination in retaliation for A.H.'s admonishment of defendants' unconstitutional acts, to cover up those acts, and to create a fiction that the children needed medical care.  Defendants were without consent, probable cause,

court order, and any belief that exigent circumstances or conditions presented a danger to children plaintiffs that would require a medical examination.

## EIGHTH CAUSE OF ACTION: 42 U.S.C. § 1983
## FIRST AMENDMENT RETALIATION ON A.H.
(*against defendants Strand, Mills, Farrell, Sommer, Timbrouck, and Meyer*)

139.     Plaintiffs repeat the allegations contained in paragraphs 1 through 138.

140.     A.H.'s statements in the hotel room and hospital to defendants constituted protected speech under the Free Speech Clause of the First Amendment.  Defendants' acts of removing of children plaintiffs, taking A.H.'s cellular phone, forcing both to undergo two medical examinations and bearing false witness in family court hearings were in retaliation for said speech.  A.H. was prevented from speaking to her parents for six days and was unjustly the subject of family and criminal court litigation.

## NINTH CAUSE OF ACTION: 42 U.S.C. § 1983 FIRST
## AMENDMENT RETALIATION ON PLAINTIFF HARDAWAY
(*against all defendants*)

141.     Plaintiffs repeat the allegations contained in paragraphs 1 through 140.

142.     As alleged above, during four days of emergency hearings, plaintiff Hardaway zealously crossed examined defendants Mills, Stitt, Meyer, and Greene.  Plaintiff Hardaway's statements during cross examinations constituted protected speech under the Free Speech Clause of the First Amendment.  Defendants retaliated against the plaintiffs for plaintiff Hardaway's cross examinations and exercise of his family's Due Process rights by initiating a false arrest on 2/13/14, deciding to keep adult plaintiffs in jail overnight as an arbitrary punishment, filing and continuation of spurious family and criminal court proceedings, manufacturing false evidence and bearing false witness, making disparaging Facebook comments, and making harassing and intrusive home visits from February to August 2014, all in an effort to punish the plaintiffs for plaintiff Hardaway's said speech.  Adult plaintiffs did not present their case at the application to return hearing because of

defendants' unlawful acts and the family and criminal court litigation was in retaliation to plaintiff

Hardaway's exercise of free speech.

## TENTH CAUSE OF ACTION: 42 U.S.C. § 1983 ABUSE OF PROCESS § 1028 APPLICATION TO RETURN HEARING
(*against defendants Iapoce, Joern, Meyer, Greene, Stitt, Mills, and Culmone-Mills*)

143.    Plaintiffs repeat the allegations contained in paragraphs 1 through 142.

144.    As alleged above, defendants acted in actual malice, intent was to do harm by, and

collateral objectives were (a) falsely testifying in the application to return hearing that children

plaintiffs were abused and neglected, (b) to obtain a family court endorsement for defendants'

unlawful removal and cover up defendants' misconduct, (c) to punish plaintiffs for exercising their

right to Due Process, (d) to leverage adult plaintiffs into accepting unfavorable court outcomes,

and (e) to create a false narrative that the children were in need of UCDSS services.

## ELEVENTH CAUSE OF ACTION: 42 U.S.C. § 1983 ABUSE OF PROCESS 3/4/14 VIOLATION PETITION AND 4/7/14 § 1027 EMERGENCY REMOVAL PETITION
(*against defendants Iapoce, Sorkin, Joern, Webb, and Greene*)

145.    Plaintiffs repeat the allegations contained in paragraphs 1 through 144.

146.    As alleged above, defendants initiated an action contesting adult plaintiff's

application to return, acted in actual malice, intent was to do harm by, and collateral objectives

were (a) to coerce plaintiffs into accepting unfavorable resolutions in family and criminal court

disputes, (b) to dupe the family court into removing A.H., (c) to dupe the family court into holding

plaintiffs in contempt of court for violation of its protective order, and (d) to extort adult plaintiffs

into signing forms and releases not required by the protective order.  No reasonable person could

believe that A.H. was not in compliance with New York education law or that A.H. could register

in the Kingston City School District.  On August 13, 2014, both petitions ended favorably in a

family court dismissal.

**TWELFTH CAUSE OF ACTION: 42 U.S.C. § 1983 ABUSE OF PROCESS / MALICIOUS PROSECUTION NEGLECT TRIAL (2/10/14 NEGLECT PETITION)**
(*against defendants Iapoce, Joern, Greene, Webb, Meyer, Mills, and Farrell*)

147.    Plaintiffs repeat the allegations contained in paragraphs 1 through 146.

148.    As alleged above, defendants initiated a bogus neglect petition / trial, acted in actual malice, intent was to do harm by, and collateral objectives were (a) to testify that adult plaintiffs were away from the hotel on 2/8/14 longer than they actually were and unreachable by telephone so the family court would find that adult plaintiffs had been neglectful, (b) to compel plaintiffs into accepting an unfavorable resolution to family and criminal court disputes, and (c) to legitimize defendants' unlawful acts in violation of plaintiffs' constitutional rights.  The neglect petition / trial ended favorably for plaintiffs with the family court dismissal on August 13, 2014.

**THIRTEENTH CAUSE OF ACTION: 42 U.S.C. § 1983 FALSE ARREST / FALSE IMPRISONMENT OF ADULT PLAINTIFFS**
(*against defendants Strand, Negron, Bowers, Mills, Farrell, Culmone-Mills, and Stitt*)

149.    Plaintiffs repeat the allegations contained in paragraphs 1 through 148.

150.    As alleged above, defendants intended to confine / arrest adult plaintiffs; adult plaintiffs were conscious of their confinement; adult plaintiffs did not consent to the confinement and were not free to leave; adult plaintiffs' confinement was not privileged by any legal justification and was without probable cause.

**FOURTEENTH CAUSE OF ACTION: EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
(*against defendants Strand, Negron, Bowers, and Mills*)

151.    Plaintiffs repeat the allegations contained in paragraphs 1 through 150.

152.    As alleged above, plaintiff Hardaway suffered a sufficiently serious deprivation of vital medication and medical care while in custody of defendants.  Defendants knowingly and maliciously denied plaintiff Hardaway necessary medical attention and medication.

## FIFTEENTH CAUSE OF ACTION: 42 U.S.C. § 1983
## DENIAL OF A RIGHT TO A FAIR TRIAL
(*against defendants Negron, Bowers, Mills, Farrell, Culmone-Mills, and Stitt*)

153.    Plaintiffs repeat the allegations contained in paragraphs 1 through 152.

154.    As alleged above, defendants Stitt, Mills, Farrell, Bowers, Strand, Culmone-Mills, and Negron withheld exculpatory evidence from UCDAO and forwarded the fabricated evidence, false sworn statements, and perjured testimony to UCDAO.  The materials forwarded to UCDAO would have adversely influenced a jury decision.  As a result of defendants' unlawful actions, adult plaintiffs were arrested, suffered a deprivation of liberty, and spent nine months in protracted criminal court litigation.

## SIXTEENTH CAUSE OF ACTION: 42 U.S.C. § 1983 MALICIOUS PROSECUTION
(*against defendants Negron, Bowers, Mills, Farrell, Culmone-Mills, and Stitt*)

155.    Plaintiffs repeat the allegations contained in paragraphs 1 through 154.

156.    As alleged above, defendants were directly and actively involved, did not make a complete and full statement of facts, acted with actual malice, without probable cause, used fraud and perjury, misrepresented and falsified evidence, withheld exculpatory evidence, in the initiation and continuation of criminal proceedings against adult plaintiffs when dealing with UCDAO. Defendants' actions were a perversion of proper legal process.  Defendants' prosecution was not privileged, was maintained for over nine months, and dismissed in favor of adult plaintiffs on October 31, 2014.

## SEVENTEENTH CAUSE OF ACTION: STATE LAW MALICIOUS PROSECUTION
(*against defendants Negron, Bowers, Mills, Farrell, Culmone-Mills, and Stitt*)

157.    Plaintiffs repeat the allegations contained in paragraphs 1 through 156.

158.    As alleged above, defendants, acting with actual malice, commenced and maintained a criminal proceeding against the adult plaintiffs without probable cause.  From February to October 2014, plaintiffs were forced to repeatedly make appearances in Kingston City Criminal Court to defend themselves against the unlawful prosecution until it was ultimately

dismissed in plaintiffs' favor October 31, 2014.  Defendant City, as employer of KPD officers, is responsible for their wrongdoing under the doctrine of *respondeat* superior.

### EIGHTEENTH CAUSE OF ACTION: 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS
(*against all defendants*)

159.    Plaintiffs repeat the allegations contained in paragraphs 1 through 158.

160.    As alleged above, the acts of defendants were intended to and did deprive plaintiffs of substantive rights guaranteed by the US Constitution and State of New York as described herein. These deprivations were so egregious, outrageous, arbitrary, and were a disgraceful gross abuse of governmental authority that shocks the conscious.

### NINETEENTH CAUSE OF ACTION: 42 U.S.C. § 1983 MUNICIPAL LIABILITY
(*against defendants City, Ulster, and defendants Iapoce, Sorkin, and Carnright (hereinafter "Supervisory Defendants")*)

161.    Plaintiffs repeat the allegations contained in paragraphs 1 through 160.

162.    Policy and Practices:

   a.  Defendant Ulster has a policy and practice of using legal process to achieve illegitimate collateral objectives.

   b.  Defendant Ulster's NY FCA § 1024 emergency removal notice unconstitutionally denies all parents Due Process and a New York State-created liberty interest.

   c.  Defendants City has a policy and practice of entering and searching hotel rooms which have been rented to guests, without a warrant, consent of the guest, exigent circumstances, or probable cause.

   d.  Defendant Ulster has a policy and practice of entering and searching hotel rooms which have been rented to guests, without a warrant, consent of the guest, exigent circumstances, or probable cause.

163.    Failure to Train:

   a.  Defendant City failed to train personnel on the imminent danger requirements of NY FCA § 1024 or the Fourth Amendment necessity for exigent circumstances as a foundation for removal of children.

   b.  Defendant Ulster failed to train personnel on the imminent risk and danger requirements of NY FCA §§ 1022, 1024, or 1027 (the three NY FCA emergency

removal statutes) or the Fourth Amendment necessity for exigent circumstances as a foundation for removal of children. The unconstitutional NY FCA § 1024 emergency removal notice is by itself evidence of a failure to train.

c. Defendant Ulster failed to train defendants on the lawful use of legal process provided to UCDSS and UCDAO under New York State law.

d. Defendant City failed to train personnel on the constitutional limits of the Fourth Amendment and the requirements of Due Process protections.

e. Defendant Ulster failed to train personnel on the constitutional limits of the Fourth Amendment and the requirements of Due Process protections.

164.   Failure to Supervise:

a. Supervisory defendants directly participated in the constitutional violations herein.
   i. Defendant Carnright maintained an unjust prosecution in keeping with defendant Ulster's policy and practice described in paragraph 162.a. even after the family court case was dismissed as unfounded, meeting with subordinates, and reviewing the family court transcripts. Defendant Carnright had supervision over all UCDAO employees listed herein.
   ii. Defendant Iapoce signed the specious neglect and violation petitions which were in keeping with defendant Ulster's policy and practice described in paragraph 162.a. and had supervision over all UCDSS employees listed herein.
   iii. Defendant Sorkin supervised the filing of the spurious 4/8/14 § 1027 emergency removal petition which was in keeping with defendant Ulster's policy and practice described in paragraph 162.a. Defendant Sorkin had supervision over all UCDSS employees listed herein except defendant Iapoce.

b. Supervisory defendants had knowledge legal process was being routinely used by UCDSS to achieve illegitimate collateral objectives.

c. Supervisory defendants created policies and practices that fostered a culture where acts like racial and religious bigotry, perjury, manufacturing of evidence, suppression of evidence, unlawful use of legal process, and collusion to cover up unlawful acts are commonplace, tolerated, and spoken of openly on Facebook, during sworn testimony, in UCDSS, KPD, and UCDAO business records, and courthouse courtrooms, meeting rooms, parking lots, and hallways.

d. Supervisory defendants were grossly negligent in supervising the subordinates listed in this complaint.

### TWENTIETH CAUSE OF ACTION: 42 U.S.C. § 1983 CONSPIRACY TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS
#### (*against all defendants*)

165.     Plaintiffs repeat the allegations contained in paragraphs 1 through 164.

166.     As alleged above, there were many references in family and criminal court hearings, depositions, and defendants' business records detailing email, telephone, and in-person meetings between defendants where defendants planned and agreed on actions and subsequently implemented those actions that deprived plaintiffs of their constitutional rights.  The unlawful and unconstitutional acts of defendants were part and parcel of an agreement and conspiracy between various individual defendants to maliciously violate plaintiffs' civil rights.  Each of the individual defendants was aware of, agreed to, and/or approved at least one overt act in furtherance of their conspiracy.

### TWENTY-FIRST CAUSE OF ACTION: EQUAL PROTECTION
#### (*against all defendants*)

167.     Plaintiffs repeat the allegations contained in paragraphs 1 through 166.

168.     Class of One: Defendants Mills, Stitt, and Greene intentionally discriminated against plaintiffs on the basis of race, religion, and economic status.

169.     Selective Enforcement: Plaintiffs are in an identified class of families that leave responsible, mature, and intelligent children home alone of indeterminate periods of time (latchkey families).  Plaintiffs' latchkey family was treated differently from other latchkey families in that children plaintiffs were removed; adult plaintiffs were investigated, arrested, and faced allegations in family and criminal court; and all plaintiffs endured prolonged criminal and family court litigation when other latchkey families are not even investigated by defendants Ulster or City.  There was no rational basis for the disparate treatment of plaintiffs.   Upon information and belief, the conflict of interest between defendants Culmone-Mills and Mills also prevented UCDAO and UCDSS from applying the law in an evenhanded manner.

170.    The twenty-one cause of actions complained of above were taken under color of state law, violated plaintiffs' rights as guaranteed by the Constitution, by New York State laws, and are also a violation of 42 U.S.C. § 1983.

171.    As a direct and proximate result of the above mentioned unconstitutional acts described in the twenty-one cause of actions, plaintiffs have been harmed.

WHEREFORE, plaintiffs pray this Honorable Court grant plaintiffs demand of judgment against the defendants, jointly and severally, for the relief set forth below.

## DEMAND FOR PUNITIVE AND OTHER DAMAGES

172.    The actions and inactions of the individual defendants as described above were extreme, outrageous, and shock the conscience of a reasonable person and an award of punitive damages is appropriate.

173.    As a direct and proximate result of the acts of defendants, plaintiffs were harmed and suffered the following injuries and damages:

a.    Violation of their rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their home and persons;

b.    Violation of their rights pursuant to the Fourteenth Amendment right to Due Process under the United States Constitution;

c.    Violation of their rights pursuant to the Eighth Amendment of the United States Constitution prohibition against cruel and unusual punishment;

d.    Violation of their New York State Constitutional rights under Article 1, Section 12 to be free from an unreasonable search and seizure;

e. Violation of their New York State Constitutional rights under Article 1, Section 6 to Due Process;

f. Physical pain and suffering;

g. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

h. Loss of liberty; and

i. Attorney's and court fees.

## PRAYER FOR RELIEF

174. A judgment in favor of the plaintiffs for each cause of action and against all defendants for fair and reasonable compensatory damages in an amount to be determined by a jury.

175. A judgment in favor of the plaintiffs and against all individual defendants for punitive damages in an amount to be determined by a jury.

176. A monetary award for attorney's fees, costs, and disbursements for this action (pursuant to 42 U.S.C. § 1988).

177. Any other relief this Honorable Court finds to be just, proper, and equitable.

178. A permanent injunction ordering defendant Ulster to add the name, title, organization, address, and telephone number of the caseworker removing a child to all future §1024 removal notices.

179. A declaratory judgment, pursuant to 28 U.S.C. § 2201 *et seq.*, declaring unconstitutional:

a. Defendant Ulster's policy and practice of using legal process to achieve illegitimate collateral objectives;

b. Defendant Ulster's policy and practice of using a NY FCA § 1024 emergency removal notice which denies all parents Due Process and a New York State-created liberty interest;

c. Defendant City's policy and practice of entering and searching hotel rooms which have been rented to guests, without a warrant, consent of the guest, or exigent circumstances; and

d. Defendant Ulster's policy and practice of entering and searching hotel rooms which have been rented to guests, without a warrant, consent of the guest, or exigent circumstances.

## DEMAND FOR JURY TRIAL

180.    Plaintiffs demand a trial by jury.

RESPECTFULLY SUBMITTED this 3rd day of December, 2015 by:

Plaintiff Johnathon Hardaway, Esq.
Attorney for Plaintiffs
Bar Roll Number 519695
5185 MacArthur Boulevard, NW, Suite 611
Washington DC 20016
Phone: (202) 321-3200
Facsimile: (202) 449-4124
Email: j_hardaway_iii@hotmail.com

Plaintiff Angie Callwood